IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARY GONZALES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-10-1176 |
| | § | |
| MICHAEL J. ASTRUE | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for

Summary Judgment (Document No. 21), and Memorandum in Support (Document No. 22), and

Defendant's Motion for Summary Judgment (Document No. 23) and Memorandum in Support

(Document No. 24). After considering the cross motions for summary judgment, the

administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set

forth below, that Defendant's Motion for Summary Judgment (Document No. 23) is DENIED,

Plaintiff's Motion for Summary Judgment (Document No. 21) is GRANTED, and the decision

of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on September
30, 2010. (Document No. 14).

## I.  Introduction

Plaintiff, Mary Gonzales ("Gonzales"), brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability benefits. According to Gonzalez, substantial evidence does not support the ALJ's decision, and the ALJ, Gary J.  Suttles, committed errors of law when he found that Gonzales was not disabled at any time from July 31, 2006, through December 31, 2008, her date of last insured.  Gonzales argues that she was in fact insured through December 31, 2011, and that had the ALJ had the benefit of a psychological evaluation by Dr.  Jim Whitley, the outcome would have been different.  Gonzales seeks an order reversing the Commissioner's decision and remanding her claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Gonzales was not disabled, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II.  Administrative Proceedings

On October 25, 2007, Gonzales applied for disability insurance benefits claiming that she has been unable to work since July 31, 2006, as a result of injuries sustained from a car accident. (Tr.  100-103).  The Social Security Administration denied her application at the initial and reconsideration stages.  (Tr.  62-63).  Gonzales then requested a hearing before an ALJ.  The Social Security Administration granted her request, and the ALJ held a hearing on March 19, 2009.  (Tr.  23-61).  On April 14, 2009, the ALJ issued his decision finding Gonzales not

disabled.  (Tr.  7-22).  In his decision, the ALJ found that Gonzales was not disabled at any time from July 31, 2006, through December 31, 2008, her date of last insured.

Gonzales sought review by the Appeals Council of the ALJ's adverse decision.  (Tr. 6).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence.  After considering Gonzales's contentions, including the submission of additional evidence, in light of the applicable regulations and evidence, the Appeals Council, on January 8, 2010, corrected an error in the ALJ's decision regarding the date that Gonzales was last insured to reflect the correct date of December 31, 2011, but further concluded that there was no basis upon which to grant Gonzales request for review.  (Tr. 2-5).  The ALJ's findings and decision thus became final.  Gonzales has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The Commissioner has filed a Motion for Summary Judgment (Document No. 23).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No.  21).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 532 (Document No. 9).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is, only: "to [determine] (1)

3

whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial

evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of

5

impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his April 14, 2009, decision that Gonzales was not disabled at step five because she retained the residual functional capacity to perform jobs that exist in significant numbers in the national economy.  In particular, the ALJ determined that Gonzales was not presently working (step one); that Gonzales' hepatitis C, carpal tunnel syndrome, degenerative disc disease, status post cervical discectomy, and major depressive disorder were severe impairments (step two); that Gonzales did not have an impairment or combination of impairments that met or medically equaled one the listed impairments in

6

Appendix 1 of the regulations (step three); that Gonzales had the residual functional capacity to

perform a limited range of light work[2]; that Gonzales was unable to perform her past relevant

work as a nurse's aide, laboratory technician or customer service representative (step four); and

that Gonzales' impairments did not prevent her from performing jobs that exist in the national

economy, taking into consideration her age, education, work experience, and residual functional

capacity to perform light, unskilled occupations such as an assembly press operator, an electrical

ceiling operator, and as a shipping weigher (step five).

Here, at issue, is the Appeals Council's determination that medical evidence submitted to

the Appeals Council would not change the ALJ's decision.  The evidence at issue is a

psychological evaluation that was performed by Jim C.  Whitley, a clinical psychologist, on April

23, 2009.  According to Gonzales, Dr.  Whitley's evaluation undermines the Commissioner's

decision.  In addition, Gonzales argues that the ALJ's decision was flawed because the ALJ

erroneously calculated the date she was last insured.

By way of background information, Gonzales suffers from the following ailments:

---

[2] With respect to Gonzales RFC, the ALJ found:
The claimant is able to lift and carry 20 pounds occasionally and 10 pounds
frequently, stand and walk about 6 hours in an 8 hour day, and sit for at least 6
hours in an 8 hour day.  The claimant has unlimited abilities to push and pull and
unlimited gross and fine dexterity.  Although the claimant is able to occasionally
climb stairs, she is unable to do any running or climbing of ladders, ropes, or
scaffolds.  The claimant is unable to be exposed to unprotected heights or
dangerous machinery.  She is able to tolerate limited exposure to dust, fumes,
gasses, and chemicals.  The claimant is able to do frequent fingering, bilaterally,
with her fingers and hands.  The claimant is able to bend, stoop, crouch, crawl,
twist, and squat.  She can occasionally balance.  Mentally, the claimant is able to
get along with others, understand simple instructions, concentrate on and perform
simple tasks, and respond and adapt to changes in the workplace and supervision.
(Tr.  13-14).

hepatitis C, carpal tunnel syndrome, degenerative disc disease, status post cervical discectomy, and major depressive disorder.  Gonzales received medical care at the Bayshore Family Practice Center, where she was seen by Dr.  Glenda Goodine or Dr.  Jean Dolan, and later at the Strawberry Clinic.  The earliest medical records from February and March 2006, show that Gonzales has chronic hepatitis C, genotype I.  She underwent pegylated interferon/ribavirin treatment but relapsed.  (Tr.  225-226, 252).

Gonzales was in an car accident in July, 2006.  After the accident she was treated at the Methodist Hospital for atypical chest pain.  (Tr.  170-174, 273, 275-276, 282, 291, 341-343, 349-358).  Her blood work and chest x-rays were normal.  *Id.*  Gonzales continued to experience chest pain following the accident and sought medical attention at the Bayshore Family Practice Clinic on July 31, August 4, August 9, August 22, and 28, 2006.  (Tr.  241-250).  The treatment notes show that Gonzales was "very anxious," complained of "pressure in head" and felt like something was stuck in her chest.  (Tr.  248-49, 243-44).  Based on her complaints, Gonzales was referred to a cardiologist, Dr.  John Yu.  Gonzales' EKG was normal.  Dr.  Yu opined that she had musculoskeletal chest pain.  (Tr.  223).

Gonzales was referred to River Oaks Imaging for cervical spine x-rays.  The x-rays revealed normal alignment of the cervical spine.  (Tr.  224).  Because Gonzales' complaints of head pain did not resolve,  Dr.  Dolan referred her to Dr.  Holly Knudsen Varner with Space Center Neurology.  In September 2006,  Dr.  Varner noted that Gonzales' mental status exam was normal, and that she was neurologically intact.  Dr.  Varner diagnosed Gonzales as having suffered a concussion with post concussive syndrome and prescribed Neurontin for headache pain.  (Tr.  221-222, 306-307, 324-325).  Gonzales continued to complain of pain.  Dr.  Varner

referred Gonzales for testing which she underwent in October and November.  The results of an

MRA of the  neck was normal.  Likewise, her EEG was normal.  An MRI of the brain showed an

area of abnormal T2 signal in the right posterior frontal deep white matter.  (Tr.  219-220, 263,

264, 271, 272, 273, 278-279, 280, 304-305, 322-326, 332, 333, 339, 340, 345, 347).  The results

of an MRI of the cervical spine showed she had a large herniated disc at C6-7 extending

posteriorly and just right of midline. In addition, she had "mild spondylotic changes at C5-6

resulting in mild neural foraminal narrowing bilaterally."  (TR.  269-270, 337-338, 369-370).  A

thoracic spine x-ray was normal.  (Tr. 268, 336).  Left and right x-rays of the ribs showed no

evidence of a fracture.  (Tr.  265, 267, 334, 335).  Lumbar spine x-rays showed that she had

"bilateral L5 pars defects with slight, Grade I, anterolisthesis of L5 on S1.  (Tr.  266).

The medical records further show that Gonzales had a follow up cardiology appointment

with Dr.  Yu on December 19, 2006, where she complained of chest pain. Based on his clinical

findings, Dr.  Yu opined that "from the cardiovascular standpoint, there is no clear

contraindication to return to work."  (Tr.  218).

In 2007, the records show that Gonzales continued to be seen by Dr.  Varner.  At her

January 9, 2007, appointment Gonzales reported headaches.  The results of Dr.  Varner's

examination revealed that Gonzales was neurologically intact.  Dr.  Varner prescribed Lexapro

for mood stabilization and Lyrica for pain.  Because of Gonzales's ongoing complaints of

headache pain, Dr.  Varner referred Gonzales for additional testing at River Oaks Imaging.  The

results of a MRA of the head was normal.  A MRI of the lumbar spine confirmed the pars defect

of L5 bilaterally.  (Tr.  214, 215, 259, 260, 261, 330, 331).   A CT of the lumbar spine showed

Grade I anterolistehsis of L5 on S1 secondary to bilateral pars defects at L5.  (Tr.  257-58, 328).

A CT of the facial bones revealed no evidence of bone fracture.  (Tr.  256, 327).  Dr.  Varner

opined that Gonzales was developing progressive myelopathic symptoms because of the large

disc herniation at C6-7, and she suggested that Gonzales seek a surgical opinion.  ( Tr.  189, 302,

320).   On February 28, 2007, and March 21, 2007, Gonzales was examined by Dr.  Edward C.

Murphy, a neurosurgeon for her herniated cervical disc at C6/7.  (Tr.  364-367, 372-373).  She

had surgery in April.  At her first post-operative visit on April 11, 2007, Dr.  Murphy wrote that

Gonzales was "doing very well.  She is not having any significant problems.  She can ride, she

can drive her car and she can do small chores."  (Tr.  362, 363, 368).  Dr.  Varner subsequently

noted the following month at Gonzales' May 29, 2007, office visit that she "continues to

improve."  Neurologically her exam was normal except for a decrease in pinprick in the upper

extremities, predominately the hands.  (Tr.  296, 301, 319).  Based on the pinprick results, Dr.

Varner ordered an EMG study.  The EMG study was conducted on May 31, 2007.  It was

abnormal.

The medical records show that Gonzales had her yearly appointment with Dr.  Yu on June

20, 2007.  She complained of chest pain and palpitations.  (Tr.  208).  Notwithstanding her

complaints, the results of an EKG, myoview stress study and echocardiogram were normal, as

was a thyroid test.  (Tr.  205-207).  Dr.  Yu opined that the pain might have a musculoskeletal

etiology since there was no cardiac basis for the pain.

Gonzales had a follow up neurology appointment with Dr.  Varner in August 2007.  Dr.

Varner noted that Gonzales continued to have residual symptoms of post-concussive syndrome

and myelopathic symptoms from her prior cervical stenosis.  Dr.  Varner opined that she

expected "these to improve."  (Tr. 202, 293, 311).  She further noted that Gonzales might have

carpal tunnel syndrome based on the results of the nerve conduction study.  (Id.)  Gonzales had a follow-up appointment with Dr.  Varner on November 2, 2007.  According to Dr.  Varner, she "expect[s] her to improve and her symptoms to resolve." (Tr.  197, 292, 309).  A week later, Gonzales complained to Dr.  Varner of neck pain and headaches.  Dr.  Varner recommended that Gonzales be evaluated by a neurotherapist for cognitive testing for her complaints of memory loss, cognitive impairment and chronic headache. (Tr.  230-31).  On November 12, 2007, Gonzales had a follow-up office visit with Dr.  Murphy.  According to Dr.  Murphy, Gonzales had "made a good recovery from her neck problems." (Tr.  261).

On February 6, 2008, Gonzales had a follow up cardiology appointment with Dr.  Yu, at which she complained of chest pain.  Dr.  Yu noted that her EKG was normal.  He referred her for x-rays, a sonogram and a mammogram.  The tests showed no abnormalities. (Tr.  409, 411-414).

At her March 12, 2008, appointment at the Bayshore Clinic, the doctor noted she had poor eye contact, was depressed and reported that she heard "people talking about her" and that she had "another personality." (Tr.  427-428).  Since the fall of 2008, Gonzales received medical care at the Strawberry Clinic.  Her primary doctor was Dr.  Thomas Masciangelo. (Tr.  498).  Dr.  Masciangelo treated Gonzales for chronic pain control. (Tr.  498).  In January and February 2009, Gonzales was treated for carpal tunnel syndrome. (Tr.  474-496, 500-505).  She underwent an MRI of the brain on January 22, 2009.  The MRI revealed that she had 2 tiny foci of high flair signal in the subcortical white matter of the frontal lobes which may represent ischemic lesions.  According to the radiologist, such lesions are common in patients with migraine headaches or microanglopathic ischemic changes. (Tr.  507).

11

In connection with her DIB application, a residual functional assessment of Gonzales' physical capabilities was completed by a DDS physician in February 2008. (Tr. 374-381). According to the assessment, Gonzales could occasionally lift and carry 20 pounds, could frequently lift and carry 10 pounds, could stand and/or walk for a total of 6 hours in an 8 hour workday, could sit about 6 hours in an 8-hour workday, and could push and/or pull for an unlimited time. As to postural limitations, the DDS physician found that Gonzales could never climb ladder/rope/scaffolds, but could frequently climb ramps/stairs, stoop, balance, kneel, crouch, and crawl. The DDS physician further opined that Gonzales had limited fingering but was otherwise unlimited and that she had no visual limitations, communicative limitations, and environmental limitations.

In addition, a Psychiatric Review Technique ("PRT") form was completed by Charles McDonald on February 2, 2008. (Tr. 390-403). Dr. McDonald did not examine Gonzales The evaluation was based on his review of Gonzales's records. Dr. McDonald opined that Gonzales had an affective disorder and mild depressive disorder, mild, recurrent. According to Dr. McDonald, Gonzales would have mild limitations in her restriction of activities of daily living, and difficulties in maintaining concentration, persistence and pace. In all other areas, she had no limitations.

A second PRT and Mental Residual Functional Capacity Assessment was completed by Cate Miller, M.D. based on her review of Gonzales' records on May 29, 2008. (Tr. 435-448, 449-452). Dr. Miller opined that Gonzales had had no episodes of decompensation, and had only mild restrictions of activities of daily living. She further opined that Gonzales had moderate limitations in maintaining social functioning, and maintaining concentration, persistence or pace.

With respect to Gonzales's mental RFC, Dr. Miller opined that Gonzales could understand remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings. Dr. Miller further opined that Gonzales had moderate restrictions in several areas: her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

Gonzales also has undergone two consultative psychological evaluations. The first was conducted on February 13, 2008, by Larry Pollock. Dr. Pollock specialized in neuropsychology, He conducted a clinical interview and a mental status examination. (Tr.384-387). Dr. Pollock noted that Gonzales had normal gait and could walk independently, she had no serious motor impairments, and was able to use her hands with normal dexterity. According to Gonzales, her primary complaint was that she experiences "black outs", that she finds that things do not "look normal" and she cannot recall how she arrived at a destination. (Tr. 384). Gonzales' mental status examination revealed the following:

Appearance, Behavior and Speech: Ms. Gonzales was appropriately dressed for

13

the season, weather and occasion.  Her hygiene and grooming were good.  There were no apparent defects in her speech.

Thought Processes: Ms.  Gonzales's thought processes appeared normal and free of delusions and hallucinations.

Mood and Affect: Ms.  Gonzales had a depressed mood, and her affect was constricted.

Sensorium and Cognition: Ms.  Gonzales was oriented to person, place, and time. She gave the correct year, month, day, city, state, and current president.  She was able to name two past presidents in sequential order.  She was able to repeat three words and recalled two of the three five minutes later.  She was able to spell WORLD forward and backward.  She was able to recall 4-digits forward and 5-digits backward.  Her abstracting ability was good and her clock drawing was within normal limits with 10 out of 10 points.

Judgment and Insight: Ms.  Gonzales has poor insight into her condition.  Her social judgment and common sense were good.  When asked what she would do if she found a wallet on the floor of a store, she said she would "try to contact the owner or take it to the police station."

Based on the results of the mental status examination and interview, Dr.  Pollock diagnosed

Gonzales with Major Depressive Disorder, Recurrent Episode, Mild, and assessed her a Global

Assessment of Functioning ("GAF") of 58.[3]  With respect to Gonzales' prognosis, Dr.  Pollock

wrote:

Ms.  Gonzales is suffering from crying spells, frustration, weight gain, and difficulty sleeping as a result of a car accident in 2006 and the loss of her job.  She also reported that she "loses time" and blacks out for minutes or even days at a time.  She is an intelligent woman with a loving and supportive family.  She is able to perform most activities of daily living, complete tasks, and care for her 4-year old grandson.  Her prognosis is guarded.  (Tr.  387).

After the ALJ had issued his decision, Gonzales underwent another  psychological

---

[3] A GAF of 58 indicates "moderate symptoms or moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with co-workers.)" *Diagnostic & Statistical Manual of Mental Disorders* p.  34 (4th Ed.  2000).

evaluation with a full battery of tests by Jim C.  Whitley, Ed.D, a clinical psychologist.  (Tr.  510-517).  According to Dr.  Whitley, Gonzales identified as her primary complaint that she has headaches and reported that she is "losing time."  She stated that she is in constant pain in her head and arms.  (Tr.  510).  The results of the mental status examination revealed:

General Appearance: The patient was a forty-four year old Anglo female who appeared to be her stated age.  She was dressed for the occasion wearing jeans, tank top and shoes.  She was clean and neat in her attire and grooming habits, both of which reflected middle SES.

Attitude and Behavior: The patient was friendly and cooperative.  Eye contact was appropriate.  Psychomotor activity was rather slow, motivation was good, and there was no difficulty establishing rapport.

Mood and Affect: Her overall mood was subdued and her affect was clearly depressed.  She readily acknowledges being depressed and being fearful of the future.

Special Preoccupation: The patient does not report any special preoccupations at this time.  She denied any type of suicidal ideations and gestures.  She denied hallucination and delusions.  She also denied all type of drug or alcohol involvement.

Stream of Mental Activity: The patient's speech was of in English and it was of adequate flow.  There was some paucity noted and some retrieval difficulties apparent.  There was no loosening of associations, tangential thinking and/or circumstantiality.  Her speech was coherent and relevant.

Sensorium and Orientation: The patient's sensorium was clear.  She was not confused.  She knew where she was and the general purpose of the evaluation.  She was able to give current information to this examiner.

Memory: The patient knew her address, date of birth and age.  She knew her social security number.  She knew that she had coffee for breakfast.  She knew the colors of the American Flag were red, white, and blue and that the President of the United States was Bush–"Obama."  She was able to recall one of three objects at five minutes.

Concentration and Attention: The patient was able to count from one to ten without error.  She knew the days of the week– she started out by saying January,

February, — and then that was corrected and she was able to give the days without error.

She could count backwards from 20 to 0 without error.  She could spell the word *world* forward and in reverse.  She did not attempt serial 3's or serial 7's, stating, "I can't do that."

<u>Abstract Ability</u>: With regard to the proverb *do unto others*, she stated, "If you want to be treated well, if you treat them nice, I expect them to treat you nice."  With regard to *all that glitters is not gold*, she stated, "I guess all good things are not pretty good."

<u>Insight and Judgment</u>: When the patient was asked what she would do if she found an envelope in the street, she stated, "I would probably take it to the mailbox and mail it."  When she was asked what she would do if she saw smoke and fire coming from her home, the patient stated, "I would probably leave and call 911."  (Tr.  512-513).

With respect to her functional information, concerning her activities of daily living, social functioning, concentration, persistence and pace and deterioration or decompensation,  Dr. Whitley noted that the information provided by Gonzales was consistent with his own observations.  Gonzales reported that she lives with her ex-husband and that she is able to take care of her personal hygiene.  She further stated she has no friends.  She seldom drives.  She stated that she goes to the mall.  As to her concentration, persistence and pace, Dr.  Whitley noted that she "was able to concentrate but there did appear to be a slow pace and frequent lapses noted."  (Tr.  514).  He further commented about deterioration or decompensation:

Apparently, the patient has been functioning quite well, working at the same job for over five years until the accident.  Now she is not able to take care of some of the more parsimonious things, such as shopping for groceries.  This definitely would suggest deterioration.  (Tr.  514).

As part of the evaluation process, Dr.  Whitley administered several tests to Gonzales.   The Bender Gestalt Visual Motor Test was normal and she showed a good attention to detail.

16

Gonzales's score on the Wechsler Adult Intelligence Scale-3, placed her in the low average range of cognitive functioning and within the 21st percentile rank of the general population. (Tr. 514). The Wide Range Achievement Test-3 showed that Gonzales was below grade level in math but was not learning disabled. The Wechsler Memory Scale-3, revealed some memory loss in all areas tested (general memory, attention/concentration, verbal memory, visual memory, and delayed recall). Gonzales' pain patient profile score revealed above average intensity of depression and somatization symptoms. Finally, the Million Clinical Multi Axis Inventory -III, suggested "the presences of significant depression as well as some other clinical indicators of somatization." She was also "submissively dependent, self effacing and non-competitive. She has feelings of underlying tension, and emotional dysphoria. That dysphoric mood includes disturbing mixture of anxiety, sadness, guilt, insecurity and a fear of abandonment..." (Tr. 516). Based on the results of the testing and mental status examination, Dr. Whitley diagnosed at Axis I, that Gonzales had a mood disorder due to a general medical condition (depression) and somatization disorder. He assessed a GAF of 45[4] or serious symptoms. (Tr. 516). Given these findings, Dr. Whitley opined:

> Prognosis is very guarded. This condition has been ongoing since 2006. There is evidence of memory loss as well as orthopedic problems that have not been resolved. She is in constant pain and has a seizure disorder. There is evidence of post concussion symptoms.
>
> At the present time, it does not appear that the patient is capable of independent functioning or any type of gainful employment. (Tr. 517).
>
> A hearing was held on July 4, 2008. Gonzales testified at the hearing. According to

---

[4] A GAF of 45 indicates "serious symptoms...Or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic & Statistical Mental Disorders* p. 34 (4th Ed. 2000).

Gonzales, her "whole life went down" after a car accident." (Tr. 36). She reported that surgery for her cervical herniated disc helped but that it did not stop her headaches, which she described as "constant" and she described everything as being "scrambled" and she "started losing time." (Tr. 36-37, 43). Gonzales testified that she started having mental problems after the accident. (Tr. 39). Gonzales further testified that she has become forgetful and will leave water running, forget to turn the stove off, and burns things. (Tr. 45). Gonzales testified that she could not lift more than ten pounds, stand long, walk for more than four blocks or sit for longer than half an hour. (Tr. 44). Gonzales described a typical day as going outside, spending time in the back yard, and letting the dogs out. (Tr. 44-45). With respect to activities around the house, Gonzales stated she vacuums and cleans, and babysits her grandson. (Tr. 45-46). Gonzales testified that she left her Barbie doll at home and feels like she neglected her doll by not bringing it to the hearing. (Tr. 54). Karen Nielsen, a vocational expert testified about jobs in the regional and national economy based on hypothetical questions posed by the ALJ

Here, with respect to Gonzales' mental impairment, the ALJ found it not disabling based primarily on Dr. Pollock's evaluation. He wrote:

> The claimant has mild restrictions of activities of daily living and mild difficulties maintaining concentration, persistence or pace. There is no evidence of episodes of decompensation of extended duration.
>
> In support of this conclusion, the Administrative Law Judge notes that on February 13, 2008, Larry Pollock, Ph.D., gave the claimant a consultative psychological evaluation (Exhibit 7F, page 3). The claimant was appropriately dressed for the season, weather, and occasion. Her hygiene and grooming were good. There were no apparent defects in her speech. The claimant's thought processes were normal and free of delusions and hallucinations. The claimant had a depressed mood, and her affect was constricted. The claimant was oriented to person, place, and time. She gave the correct year, month, day, city, state, and current president. She was able to name two past presidents in sequential order.

She was able to repeat three words and recalled two of the three five minutes later (Exhibit 7F, page 5).  She was able to spell WORLD forward and backward.  She was able to recall 4-digits forward and 5-digits backward.  Her abstracting ability was good and her clock drawing was within normal limits with 10 out of 10 points.  Her social judgment and common sense were good.  When asked what she would do if she found a wallet on the floor of a store, she said she would "try to contact the owner or take it to the police station."

Dr.  Pollock diagnosed the claimant with a Major Depressive Disorder, Recurrent Episode, Mild.  Nevertheless, the claimant had a GAF of 58 (Exhibit 7F, page 6).  This GAF score approximates a GAF of 60, which indicates only moderate symptoms (e.g flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers.).  (Tr.  13) *See also* (Tr.  18-19).

Plaintiff argues that substantial evidence does not support the Commissioner's decision because Dr.  Whitley's evaluation undermines the evaluation relied by the ALJ in denying benefits, and that the matter should have been remanded.  Plaintiff also argues that she was prejudiced by the ALJ's erroneous calculation of her date last insured.  In response, the Commissioner argues that any error by the ALJ concerning the date Gonzales was last insured was corrected by the Appeals Council, and which evaluated the medical record through December 31, 2001, and therefore, Gonzales was not prejudiced by the error.  Further, the Commissioner argues that the Appeals Council considered the evaluation by Dr.  Whitley but found no basis to change the ALJ's decision, which impliedly concluded was supported by substantial evidence, and therefore the Appeals Council did not commit legal error by failing to remand the matter to the ALJ for consideration of Dr.  Whitley's evaluation.

Gonzales submitted additional evidence to the Appeals Council after the ALJ issued his decision denying Gonzales' application.  According to Gonzales, Dr.  Whitley's opinion, which included a full battery of testing, conflicts with and is not consistent with Dr.  Pollock's opinion

because it supports her claim that she has a disabling mental impairment that affects her RFC.

Under Fifth Circuit precedent, "evidence submitted for the first time to the Appeals Council is part of the record on appeal [.] *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). Therefore, when a claimant such as Gonzales submits new evidence and the Appeals Council denies review after considering the evidence, "the Commissioner's final decision necessarily includes the Appeal Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Id.* at 336 (internal quotation marks and citations omitted). The Appeals Council is not, however, required to provide a detailed analysis of, or otherwise explain the weight to be given, to new evidence. *See Higginbortham* , 405 F.3d at 335 n.1. Remand is warranted only if the new evidence *dilutes* the record to such an extent that the ALJ's decision become insufficiently supported. *Higginbotham v. Barnhart*, 163 F.App'x 279, 281-82 (5th Cir. 2006)(emphasis added).

Upon this record, the evaluation by Dr. Whitley is relevant to Gonzales' claim, and that it could not have been submitted earlier because it was not completed until after the ALJ issued his decision. Both Drs. Pollock and Whitley interviewed Gonzales and completed a mental status examination. Dr. Whitley's evaluation was more comprehensive than that of Dr. Pollock. Dr. Whitley administered a fall battery of tests including the Bender Gestalt Visual Motor Test, Wechsler Adult Intelligence Scale-3, Wide Range Achievement Test-3, Wechsler Memory Scale-3, and Million Clinical Multi Axis Inventory-III.. Dr. Whitley's opinion suggests that Gonzales's mental impairment may be more severe than assessed by Dr. Pollock. Dr. Pollock noted no episodes of decompensation. Dr. Whitley noted signs of decompensation. The two differed on Gonzales' overall prognosis. Dr. Pollock opined it was "guarded." In contrast, Dr.

Whitley opined that it was "very guarded."  The GAF scores are also markedly different.  In *Boyd v.  Apfel*, 239 F.3d 698, 701 (5th Cir.  2001), the Fifth Circuit wrote that "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social and occupational functioning.'" (citations omitted).  The Fifth Circuit further noted that a GAF score of 41 to 50 is classified as reflecting "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop lifting) or any serious impairment in social, occupational, or school functioning (e.g, no friends, unable to keep a job")."  *Id.* Here, the ALJ relied on Gonzales' having a GAF score of 58, which indicated moderate symptoms, in addressing whether Gonzales had a disabling mental impairment and in assessing her RFC.  The subsequent evaluation revealed that Gonzales had a GAF score of 45, which suggests a deterioration in her condition.  Upon this record, Dr.  Whitley's evaluation dilutes the ALJ's decision.  Because of the conflicts between the psychological evaluations performed by Dr. Pollock on February 13, 2008, and Dr.  Whitley on April 23, 2009, which has diluted the record to the extent that the ALJ"s determination is no longer supported by substantial evidence, the matter must be remanded for consideration of Dr.  Whitley's opinion and its impact on Gonzales's claim for benefits.


**V.  Conclusion**

Based on the foregoing, and the conclusion that substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (No.23), is DENIED, Plaintiff's Motion for Summary Judgment (Document No.  21) is GRANTED, and that this case

21

is remanded to the Social Security Administration pursuant to 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 2nd  day of September, 2011.

_Frances H. Stacy_
Frances H. Stacy
United States Magistrate Judge